KAREN P. HEWITT
United States Attorney
LAWRENCE A. CASPER
CHRISTINA M. McCALL
Assistant U.S. Attorneys
California State Bar Nos. 235110/234139
Federal Office Building
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: (619) 557-7455/(619) 235-2757 (Fax)
Lawrence.Casper@usdoj.gov
Christina.McCall@usdoj.gov

Attorneys for Plaintiff
United States of America

**UNITED STATES DISTRICT COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | Criminal Case No. 07CR3315-BEN |
| Plaintiff, | ) | **GOVERNMENTS' TRIAL MEMORANDUM** |
| v. | ) | |
| ALEJANDRO SAUCEDO-VIRGEN, | ) | Date:  February 12, 2008<br>Time:  9:00 a.m.<br>Courtroom: 3 (Fourth Floor)<br>Honorable Roger T. Benitez |
| Defendant. | ) | |

COMES NOW Plaintiff, UNITED STATES OF AMERICA, by and through its counsel, KAREN P. HEWITT, United States Attorney, and LAWRENCE A. CASPER AND CHRISTINA M. McCALL, Assistant United States Attorneys, and hereby files its Trial Memorandum.

//
//
//
//
//
//
//
//

**I.**

**STATEMENT OF THE CASE**

**A.    CHARGES & INDICTMENT**

On November 13, 2007, Defendant was charged in a one-count Complaint with Bringing in Illegal Aliens Without Presentation, in violation of Title 8, U.S.C., Section 1324(a)(2)(B)(iii). On December 11, 2007, a federal grand jury returned a six-count Indictment charging the Defendant with Bringing in Illegal Aliens for Financial Gain, in violation of Title 8, U.S.C. Section 1324(a)(2)(B)(ii), and Title 18, USC Section 2; and Bringing in Illegal Aliens Without Presentation, in violation of Title 8, U.S.C., Section 1324(a)(2)(B)(iii). On the same day, Defendant entered a not guilty plea.

**B.    TRIAL STATUS**

Hearings on motions and motions in limine are scheduled for February 11, 2008 at 2:00 p.m. Trial is scheduled for February 12, 2008, at 9:00 a.m., before the Honorable Roger T. Benitez. The Government anticipates that its case-in-chief will take 1 ½ days.

**C.    STATUS OF DEFENDANT**

Defendant has been in custody since the date of his arrest.

**D.    STATUS OF COUNSEL**

Defendant is represented by Paul Blake, Esq.(appointed counsel).

**E.    INTERPRETER**

The Government will need a Spanish language interpreter for three (3) of its witnesses. Defendant is also expected to require an interpreter.

**F.    JURY WAIVER**

Defendant has not waived trial by jury.

**G.    PRETRIAL MOTIONS**

Defendant filed motions in limine on February 4, 2008.

The Court has set a hearing on motions in limine for February 11, 2008 at 2:00 p.m.

**H.    STIPULATIONS**

The parties have not agreed to any stipulations.

**I.     DISCOVERY**

On December 19, 2007, a total of 127 pages of discovery and two (2) DVD recordings were provided to Defendant; the Government has recently produced two CDs of color photographs and other discovery materials to Defendant and anticipates providing additional materials today. Additional discovery is being provided as it becomes available to the Government. The Government has complied, and will continue to comply, with its discovery obligations. Defendant has provided no reciprocal discovery.

**II**

**STATEMENT OF FACTS**

**A.     The Instant Offense**

   1.     Defendant's Entry to the U.S.

On November 11, 2007, at approximately 9:00 a.m., Defendant entered the United States from Mexico through the Otay Mesa Port of Entry (POE) as the driver and sole visible occupant of a white 1997 Plymouth Voyager bearing Baja, California, Mexico license plate number BEB9258. Customs and Border Protection Officer (CBPO) Timothy Tenwolde conducted the primary inspection of the Defendant at Lane 11. Upon inspection, Defendant produced a valid border crossing visa (DSP-150) as his entry document and proof of identification. At that time, Defendant claimed that he had had the vehicle for six months.

CBPO Tenwolde received a negative customs declaration from Defendant. CBPO Tenwolde noticed that Defendant was avoiding eye contact and staring straight ahead during the routine inspection questions. He also observed that the vehicle had suspicous aluminum after-market (non-factory) running boards installed. CBPO Tenwolde requested that Defendant give him the vehicle keys. After Defendant complied, CBPO Tenwolde began to inspect the vehicle. When looking underneath the vehicle frame, CBPO Tenwolde noticed a non-factory compartment mounted underneath the vehicle. When looking at a metal plate installed near the center of the undercarriage, the officer observed a pair of athletic shoes protruding from the compartment. He then called for a canine enforcement officer to have the vehicle screened by a trained human detector dog. The detector dog alerted to the

undercarriage. CBPO Tenwolde called for assistance and the vehicle was driven to secondary by another CBPO.

Defendant was escorted to the Secondary Office by CBP Supervisory Officer Jose Robles. While being escorted to the office, Defendant volunteered to Officer Robles that he was just going to Wal-Mart to buy an "X-Box." Robles asked Defendant who owned the vehicle. Defendant told the officer that he had borrowed the vehicle to buy the X-Box, as his own vehicle was out of service. When patted down, Saucedo was found to have $526 (United States dollars) on his person.

        2.      <u>Discovery of three illegal aliens in the compartment underneath the vehicle</u>

In the course of inspecting the vehicle, CBP officers were able to see human hair hanging down from the compartment mounted below the undercarriage along with the pair of athletic shoes. Officers then removed the interior seats in an effort to access the compartment from inside the vehicle but they found no access from inside the vehicle. They also attempted to communicate with the people inside of the compartment, but did not immediately receive a response. CBP officers then utilized the hydraulic lift to raise the vehicle in order to better access the undercarriage. In turn, they forced open the compartment by bending down the metal panel located toward the front of the vehicle where the material witnesses were located. That created enough space for the officers to extract three (3) females concealed inside of the metal box on the undercarriage, which was located just a few inches above the ground.

        3.      <u>The Illegal Aliens / Material Witnesses</u>

Photos were taken of the compartment and the three occupants, each of whom admitted to the officers that she was a citizen and national of Mexico with no legal right to enter or remain in the United States. The three illegal aliens, identified as Imelda Baez-Reyes, Blanca Padilla-Gomez and Maria Del Rocio Juarez-De Dios, were interviewed and retained as material witnesses. The three women were also taken to Scripps Memorial Hospital in Chula Vista, as medical attention was needed.

In recorded statements, each of the material witnesses answered questions from CBP Officer Curtis. Ms. Baez and Ms. Juarez gave separate statements that were very similar. Each woman stated that she had arrived in Tijuana the previous night after flying there from Colima. Each said she met a man in downtown Tijuana who offered to cross her into the United States for $3,000. When each one

1  agreed, she was taken to an apartment building and told that she would depart the following morning.
2  The next morning each was loaded into the compartment. Each was in the compartment, underneath
3  the van, for an hour or more. Each was very hot, smelled gasoline and bumped her head or back on the
4  metal compartment every time the van went over a bump. Neither woman identified the Defendant.

5        Material witness Padilla also admitted that she had no legal right or permission to enter or
6  remain in the United States. On the day before she was found in the compartment by CBP officers, she
7  made arrangements with an unknown man and woman in Tijuana to be smuggled into the U.S. for
8  $3,500. On the day she was to be smuggled, she was picked up by a man, taken to the apartment and
9  then placed inside the compartment. It was very hot inside the compartment and her head was very close
10 to the motor. She also smelled gas and got bumped around inside of the compartment whenever the van
11 went over a rough spot on the road. She was also unable to identify Defendant.

12       **B.**    **Defendant's Post-*Miranda* Statement**

13       At approximately 11:58 a.m., Defendant was advised of his Miranda rights in Spanish by CBP
14 Enforcement Officer Jorge Rosario, as witnessed by CBP Enforcement Officer Cerda. Defendant
15 acknowledged understanding his rights, both verbally and in writing, and agreed to answer questions
16 without an attorney present. Defendant said that he was in good health and had drunk a six-pack of beer
17 the previous night at about 10 p.m. He denied any current use of narcotics or illegal drugs. He did not
18 appear to the two officers to be under the influence of any alcohol or drugs.

19       Defendant said that he is a citizen of Mexico, but has had a border crossing card for about six
20 (6) years. He has lived in a house with his wife and children for 27 years and works for a company as
21 a carpenter. He crosses the border into the U.S. on a regular basis. He owns two vehicles, but neither
22 was functional on that date. The $526 found on his person at the time of his arrest was there for the
23 purpose of buying an "X-box" video game as a gift for his brother - even though he had no money with
24 which to fix either of his vehicles so that they could be driven. He said that he could always borrow
25 money from his brother to fix the vehicles.

26       Defendant said that the previous night he had been socializing in his neighborhood with an
27 acquaintance he knows as "Rudy." He claimed to have known Rudy for about ten (10) years, but stated
28 that he didn't know Rudy's last name. Defendant told Rudy that both of his vehicles were not working

and he needed to travel to the U.S. to buy an "X-box " video game at Wal-Mart in the United States. Defendant claimed that Rudy offered to lend him his vehicle so that he could travel to the United States to buy the game. Defendant claimed that Rudy had also instructed him to meet with a woman who was the wife of the owner of the vehicle he would be driving. Rudy told him to drive to a Denny's restaurant on E Street in Chula Vista to meet this woman. Defendant claimed that Rudy had instructed him to pick up a small refrigerator from the woman. Once he had done those things, Defendant claimed Rudy said that he could go to buy the X-box using that vehicle. Defendant allegedly agreed.

At about 6:15 a.m. on the day of his arrest, Rudy called to tell him that the vehicle would be delivered to his house at about 7 a.m. Defendant stated that, because he didn't trust Rudy, he personally inspected the vehicle before driving it to the United States. Defendant said that he tapped the tires, pushed on the seat cushions, visually and physically inspected the interior of the van and found no indication of contraband being present. He added, however, that he had not looked underneath the van. He also noticed that the gas gauge on the dash was not working and claimed that he called Rudy twice before reaching the port of entry to confirm that the van was clean of all contraband. Inspection of the vehicle has confirmed that the gas gauge was stuck on "empty," that the gas tank was modified to fit the compartment, that the gas line was cut, and that a funnel was present in the vehicle. During both calls, Defendant claimed that Rudy told him that there was no contraband or persons in the vehicle. Defendant claimed that, after having received these assurances, he continued driving to the port of entry, where he was subsequently arrested.

Defendant denied knowledge of the smuggled aliens in the vehicle. He admitted that he knows that it is illegal to smuggle undocumented aliens into the United States. The last registered owner of the Plymouth Voyager van driven into the Port of Entry by Defendant was Concepcion Victorino, 14134 Via Alisal, in San Diego, California. According to TECS records, the vehicle crossed into the U.S. on two prior occasions: July 22, 2007 and October 4, 2007.

**C.    Defendant's Criminal Record**

At this time, the Government is not aware of any criminal convictions or arrests of Defendant.

## III

## LEGAL ISSUES

**A.   Elements of the Charged Offenses**

1.   Essential Elements of Title 8, United States Code, Section 1324(a)(2)(B)(ii)(Bringing in for Financial Gain)

Defendant is charged in Count 1 with bringing in illegal aliens for financial gain. The essential elements of a violation of 8 U.S.C. Section 1324(a)(2)(B)(ii) are:

   a.   Defendant brought, or attempted to bring, a person to the United States who was not a citizen of the United States;

   b.   That person had not received prior official authorization to come to, enter, or reside in the United States;

   c.   Defendant knew, or was in reckless disregard of the fact, that the person had not received prior official authorization to come to, enter, or reside in the United States; and

   d.   Defendant acted for the purpose of commercial advantage or private financial gain and with the intent to violate the immigration laws of the United States.

2.   Essential Elements of Title 18, United States Code, Section 2 (Aiding and Abetting)

Defendant is also charged in Count 1 with aiding and abetting. The essential elements of a violation of 18 U.S.C. Section 2 are:

   a.   The bringing in of illegal aliens for financial gain was committed by someone;

   b.   Defendant knowingly and intentionally aided, counseled, commanded, induced or procured that person to commit the bringing in of an illegal alien for financial gain; and

   c.   Defendant acted before the crime was completed.

9th Cir., Manual of Model Jury Instructions for the Ninth Circuit, Section 5.1 (2005).

"Aiding and abetting is not a separate and distinct offense from the underlying substantive crime, but is a different theory of liability for the same offense." United States v. Garcia, 400 F.3d 816, 820 (9th Cir. 2005). "For a defendant to be guilty of aiding and abetting, it is necessary that he in some way associate himself with the venture, that he participate in it as in something that he wishes to bring about, that he seek by his action to make it succeed." United States v. Carranza, 289 F.3d 634, 642 (9th Cir. 2002) (internal citations omitted).

1    The plain language of 8 U.S.C. § 1324(a)(2)(B)(ii) requires only that the offense be done for the
2 purpose of commercial advantage or private financial gain. See 8 U.S.C. § 1324(a)(2)(B)(ii) (describing
3 "an offense done for the purpose of commercial advantage or private financial gain"). The "offense
4 done" is bringing aliens to the United States as defined in § 1324(a)(2).

5    In United States v. Angwin, 271 F.3d 786, 805 (9th Cir. 2001), the Court held that 8 U.S.C.
6 § 1324(a)(2)(B)(ii) "does not require evidence of an actual payment or even an agreement to pay" but
7 "merely requires that the offense was done for the purpose of financial gain." Id. As such, the Angwin
8 court found that the United States did not have to provide evidence of the defendant's personal financial
9 gain. The Ninth Circuit found sufficient support for a financial gain conviction where the evidence
10 included the alien's testimony that he expected that he would have to pay for his transportation once he
11 arrived in Los Angeles, and the lack of any other possible explanation for Angwin's conduct. Id.

12   Quoting Angwin, the Court has also stated that "[b]ecause [the defendant] was charged as an
13 aider and abettor under 18 U.S.C. § 2, the government could make out this element merely by proving
14 that a principal—not necessarily [the defendant] himself—committed the crime with a pecuniary
15 motive; it need not show 'actual payment or even an agreement to pay.'" United States v. Tsai, 282
16 F.3d 690, 697 (9th Cir. 2002); see also United States v. Yoshida, 303 F.3d 1145, 1152 (9th Cir. 2002).

17   The United States can satisfy its burden of proof on the financial gain element of the offense
18 under an aiding and abetting theory "merely by proving that a principal . . . committed the crime with
19 a pecuniary motive." Tsai, 282 F.3d at 697. When the United States chooses not to proceed under an
20 aiding and abetting theory, however, "the statute requires the government to prove that [the defendant]
21 intended to derive a financial benefit from transport of the aliens" United States v. Munoz, 412 F.3d
22 1043, 1046-47 (9th Cir. 2005). Here, as in Tsai, the United States has charged aiding and abetting in
23 the indictment and is proceeding under the theory that Defendant aided and abetted someone else to
24 bring in the aliens for financial gain. In Tsai, the Court found that the following facts were sufficient
25 evidence of financial gain:

26   Chen testified that her sister paid a considerable sum (which she had to borrow) to
     smuggle her into the United States. Chen also testified that she did not know Tsai and
27   that he was neither a relative nor a friend, which eliminated possible nonpecuniary
     motives for his actions. Sufficient evidence of financial gain therefore clearly existed
28   with respect to Count III.

> Additionally, both Huang and Tsai readily made substantial out-of-pocket payments (using their La Marie credit cards) for the aliens' expenses. . . . . The government also presented expert testimony from two INS inspectors regarding the usual fees paid to escorts and the usual price paid by a smuggled alien. These factors, plus the "lack of any other possible explanation" for Tsai's willingness to make several twenty-hour trips away from his sole proprietorship in Atlanta, Angwin, 263 F.3d at 998, are probative of the element of financial gain.

Tsai, 282 F.3d at 697; see also United States v. Schemenauer, 394 F.3d 746, 751 (9th Cir. 2005) (evidence that alien intended to pay $3000 to be smuggled, and that a known smuggler arranged the trip, held sufficient to support financial gain count).

### 3. Essential Elements of Title 8, United States Code, Section 1324(a)(2)(B)(iii)(Bringing in Without Presentation)

Defendant is charged in Count 2 with bringing in illegal aliens without presentation. The essential elements of a violation of 8 U.S.C. Section 1324(a)(2)(b)(iii) are:

   a. Defendant brought or attempted to bring a person to the United States;

   b. The person was not a citizen of the United States and had not received prior authorization to come to, enter, or reside in the United States;

   c. Defendant knew or acted in reckless disregard of the fact that the person had not received prior official authorization to come to, enter, or reside in the United States when the Defendant brought in, or attempted to bring, the person into the United States;

   d. Defendant failed to bring and present the person immediately upon arrival to an appropriate immigration officer at a designated port of entry; and

   e. Defendant acted with the intention of violating the immigration laws of the United States.

**B. Co-Conspirator Statements Concerning Smuggling And Transportation Arrangements Are Admissible Under Rule 801(d)(2)(e)**

The Government submits that each of the material witnesses should be permitted to testify regarding her arrangements to be smuggled into the United States and then transported to her ultimate destination. To the extent theses arrangements and details include statements from Defendant's accomplices or the Defendant himself in the smuggling venture, the Court should admit those statements under the co-conspirator exclusion to the rule precluding hearsay.

1    An out of court statement offered for the truth of the matter asserted is normally considered
2 hearsay under Rule 801(c). However, under Rule 801(d)(2)(E), statements made by a coconspirator
3 of a party during the course and in furtherance of a conspiracy are non-hearsay. Such statements are
4 not hearsay and were deemed non-testimonial by the Supreme Court in <u>Crawford v. Washington</u>,
5 541 U.S. 36, 55 (2004). The <u>Crawford</u> decision specifically identifies co-conspirator statements as non-
6 testimonial, citing its prior decision in <u>United States v. Bourjaily</u>, 483 U.S. 171 (1987), in which the
7 Supreme Court held that even though the defendant had no opportunity to cross examine the declarant
8 at the time that he made the statements and the declarant was unavailable to testify at trial, the admission
9 of the declarant's statements against the defendant did not violate the Confrontation Clause. <u>Crawford</u>,
10 541 U.S. at 56. The Supreme Court approved its prior holding regarding co-conspirator statements,
11 citing <u>Bourjaily</u> as an example of an earlier case that was consistent with the principal that the
12 Confrontation Clause permits the admission of non-testimonial statements in the absence of a prior
13 opportunity for cross examination. <u>Crawford</u>, 541 U.S. at 57. Several Circuits have allowed such co-
14 conspirator statements post-<u>Crawford</u>. <u>See</u> <u>United States v. Cianci</u>, 378 F.3d 71, 101-2 (1st Cir. 2004);
15 <u>United States v. Sagat</u>, 377 F.3d 223, 229 (2nd Cir. 2004); <u>United States v. Mickelson</u>, 378 F.3d 810,
16 819-20 (8th Cir. 2004).

17    Co-conspirator statements are admissible under Rule 801(d)(2)(E) if the Government
18 demonstrates that (1) a conspiracy existed, (2) the defendant and the declarant were members of the
19 conspiracy, and (3) the statement was made during the course of and in furtherance of the conspiracy.
20 <u>United States v. Bourjaily</u>, 483 U.S. 171 (1987); <u>United States v. Peralta</u>, 941 F.2d 1003, 1007 (9th Cir.
21 1991), <u>cert. denied</u>, 503 U.S. 940 (1992). The existence of a conspiracy and defendant's involvement
22 in the conspiracy are questions of fact that must be resolved by the Court by a preponderance of the
23 evidence. Fed. R. Evid. 104; <u>Bourjaily</u>, <u>supra</u>, at 175. "Furtherance of a conspiracy" is to be interpreted
24 broadly. <u>United States v. Manfre</u>, 368 F.3d 832, 838 (8th Cir. 2004).

25    The Government is not required to charge the defendant with conspiracy, <u>United States v.</u>
26 <u>Layton</u>, 855 F.2d 1388 (1988), or charge the declarant as a co-defendant in any conspiracy in order to
27 admit co-conspirator statements. <u>United States v. Jones</u>, 542 F.2d 186 (4th Cir. 1976). Further, upon
28 joining the conspiracy, earlier statements made by co-conspirators after inception of the conspiracy

become admissible against the defendant. United States v LeRoux, 738 F.2d 943, 949-950 (8th Cir. 1984). In United States v. United States Gypsum Co., 333 U.S. 364, 393 (1948), the Supreme Court held that "the declarations and acts of various members, even though made prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of coconspirators in aid of the conspiracy." In other words, a defendant who joined the conspiracy at a later date, took the conspiracy as he found it. United States v. Hickey, 360 F.2d 127, 140 (7th Cir. 1966).

The Court may consider the content of the statements in determining whether the co-conspirator statement is admissible. Bourjaily, 483 U.S. at 180. Further, once the Court has ruled that the statement meets the evidentiary requirements for admission under 801(d)(2)(E), the Court need not make an additional inquiry as to whether the declarant is unavailable or whether there is any independent indicia of reliability. Id. at 182-184.

    1.    Conspiracies Existed

In this case, the conspiracies consist of the efforts made by known and unknown persons, including Defendant, the material witnesses, and any paying family member(s), to smuggle the material witness into the United States and transport them to their destination within the United States. The evidence of this conspiracy stems not only from the testimony of the material witnesses but the fact of Defendant's arrest and the lack of documentation of the material witnesses.

    2.    Defendant and the Declarants Were Members of the Conspiracy

The Government anticipates that the testimony of the material witnesses at trial will demonstrate that each made the smuggling arrangements, including agreeing on a monetary amount. As such, Defendant, each of the material witnesses, and the individuals they came into contact with during the course of the offense were part of the conspiracy.

    3.    Co-conspirator Statements Were Made During the Course of, and in Furtherance of, the Conspiracy

The co-conspirator statements that the Government contends are non-hearsay involve the smuggling arrangements made on behalf of the material witnesses, including the financial arrangements and any statements concerning their transportation from Mexico into the United States. The Government asserts that no smuggling venture would have occurred at all if not for the anticipated

payments. Thus, the financial arrangements were an integral component of the smuggling conspiracy and such statements were made in furtherance of the smuggling venture.

Moreover, even if the Court concluded that Defendant may have joined the conspiracy after the material witnesses or their family members made the arrangements for the alien smuggling and transportation, the statements are still admissible against Saucedo because the conspiracy already existed when the statements were made. See United States Gypsum Co., 333 U.S. at 393; LeRoux, 738 F.2d at 949-950; Hickey, 360 F.2d at 140.

As such, all statements regarding the financial arrangements and initial planning of the smuggling venture made on behalf of the material witness should be admissible against Defendant.

### 4.     The Court May Conditionally Admit Co-Conspirator Statements

Defendant may contend that this Court may not admit any statements until the Government lays the proper foundation for the above-referenced elements. This position lacks merit. The district court may, if needed, conditionally admit co-conspirator statements subject to a motion to strike if the Government fails to establish the requisite foundation. United States v. Reed, 726 F.2d 570, 580 (9th Cir. 1984); United States v. Loya, 807 F.2d 1483, 1490(9 th Cir. 1987).

**C.     Expert Testimony**

The Government does not anticipate calling any expert witnesses in this case.

**D.     The Court Should Preclude Self-Serving Hearsay Testimony**

The Defendant may attempt to prove his own statements through the testimony of another witness. Such efforts would be impermissible because those statements are hearsay. The Defendant cannot rely on Federal Rule of Evidence 801(d)(2) because he is the proponent of the evidence and because the evidence is not being offered against him. Rather, he is seeking to have his own self-serving hearsay statements brought before the jury without the benefit of cross examination of himself by the Government. *See* United States v. Fernandez, 839 F.2d 639, 640 (9th Cir. 1988) Under Rule 801(d)(2), a statement of a party is not hearsay <u>only</u> when it is being offered <u>against</u> the party, and not when it is being offered on a declarant's behalf.

Nor can the Defendant rely on Rule 801(d)(1)(B), which provides for an exception to the hearsay rule for a statement offered to rebut a charge of recent fabrication, since such a statement is not

admissible unless the defendant has already testified and has been impeached. <u>United States v. Navarro-Vareles</u>, 551 F.2d 1331, 1334 (9th Cir. 1976), cert. denied, 429 1045 91977).

The only exception to the hearsay rule that could possibly permit a defendant to offer his own out-of-court statements at trial would be Rule 803(3), which excludes from the definition of hearsay a statement of the declarant's "then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain and bodily health) <u>but not including a statement of memory or belief to prove the fact remembered or believed.</u>  A person's belief may not be proved by previous out-of-court statements." <u>See</u> <u>United States v. Cohen</u>, 631 F.2d 522 (5th Cir. 1980) (emphasis added).

The inadmissibility of the defendant's beliefs sought to be introduced on his behalf through other witnesses is clearly prohibited by <u>United States v. Emmert</u>, 829 F.2d 805 (9th Cir. 1987). In <u>Emmert</u>, the Ninth Circuit affirmed District Judge Brewster's exclusion of testimony by a witness that the defendant told the witness that the defendant was afraid of government agents. The court, citing <u>Cohen</u> with approval, emphasized that if the reservation in the test of Rule 803(3) [excluding evidence of a statement of belief to prove the fact believed] is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition–"I'm scared"–and not belief–"I'm scared because Galkin [the undercover agent] threatened me.

**E.     Evidence of Nervousness Is Admissible Evidence of Defendant's Guilty State of Mind**

Evidence regarding a defendant's demeanor and physical appearance is admissible as circumstantial evidence that is helpful to the jury's determination as to whether a defendant knew illegal aliens were concealed in the vehicle. Fed. R. Evid. 701; <u>United States v. Hursh</u>, 217 F.3d 761, 768 (9th Cir. 2000) (jury may consider defendant's nervousness during questioning at a port of entry); <u>United States v. Fuentes-Cariaga</u>, 209 F.3d 1140, 1144 (9th Cir. 2000) (it is within the ordinary province of jurors to draw inferences from an undisputed fact such as a defendant's nervousness at Calexico Port of Entry); <u>United States v. Barbosa</u>, 906 F.2d 1366, 1368 (9th Cir. 1990) (jury could infer guilty knowledge from a defendant's apparent nervousness and anxiety during airport inspection); <u>United States v. Lui</u>, 941 F.2d 844, 848 (9th Cir. 1991) (jury could consider guilty knowledge from a

1  defendant's acting disinterested during airport inspection); United States v. Mastberg, 503 F.2d 465, 470
2  (9th Cir. 1974) ("under the modern, and probably majority, view, a lay witness may state his opinion
3  that a person appeared nervous").  If the testimony regarding "a combination of circumstances and
4  appearances which cannot be adequately described and presented with the force and clearness as they
5  appeared to the witness, the witness may state his impressions and opinions based on what he observed."
6  United States v. Yazzie, 976 F.2d 1252, 1255 (9th Cir. 1992) (quoting United States v. Skeet, 665 F.2d
7  983, 985 (9th Cir. 1982).

Here, Government officers and agents may properly testify to Defendant's behavior, demeanor, and physical appearance, as they have personal knowledge based upon their observations of Defendant. The Government witnesses should be allowed to testify regarding Defendant's demeanor and appearance during their encounters with Defendant.

## IV

## WITNESSES

The Government reserves the right to change the order of, substitute, or add or omit one or more witnesses.  Presently, the Government may call the following witnesses during its case-in-chief:

1. Timothy Tenwolde, Customs and Border Protection
2. Ainslie Cove (CEO), Customs and Border Protection
3. Manuel Ballard, Customs and Border Protection
4. Dan Hernandez, Customs and Border Protection
5. Jose Robles, Customs and Border Protection
6. Anthony Murga, Customs and Border Protection
7. Kurt Sauer, Customs and Border Protection
8. Roberto Reyes, Customs and Border Protection
9. Leticia Ruiz, Customs and Border Protection
10. Francis Deogracias, Customs and Border Protection
11. Fernando Cerda, Customs and Border Protection
12. Jorge Rosario, Customs and Border Protection
13. Blanca Padilla-Gomez

14. Maria Del Rocio Juarez-De Dios
15. Imelda Baez-Reyes
16. Edward Chavoya, Customs and Border Protection
17. Alfredo Loperena, Customs and Border Protection

## V

## EXHIBIT LIST

The Government will provide an exhibit list on the morning of trial. The United States intends to offer into evidence some or all of the following exhibits:

1. Photographs of Vehicle
2. Photographs of compartment underneath vehicle
3. Photographs of Material Witnesses when found in Vehicle
4. Photographs of Otay Mesa Port of Entry
5. Defendant's Border Crossing Card
6. Referral Slip
7. DVD containing Defendant's post-arrest statement

The Government will make its exhibits available to the Defendant for examination in advance of trial. The Government further requests a reasonable opportunity to examine Defendant's exhibits before trial.

## VI

## PROPOSED VOIR DIRE

1. The Court will instruct you about the law. Will you follow the law as given by the Court and disregard any idea or notion you have about what the law is or should be?
2. The United States will be calling witnesses who are employed by United States Customs and Border Protection and Immigration and Customs Enforcement, or other branches of the Department of Homeland Security. Does anyone have family members or close friends who work, or have worked, for any of those agencies (or their predecessor agencies: the U.S. Customs Service and Immigration and Naturalization Service)? Would that prevent you from being fair and impartial?

3. Has anyone had an unpleasant or negative experience with any law enforcement personnel? If so, please describe. Would that cause you to be biased against law enforcement?

4. Has anyone ever had any disputes with any agency of the United States Government? If so, please describe.

5. Have you or any relatives or close friends ever been accused of, or charged with, a crime involving alien smuggling?

6. Has anyone had any training in the law? If so, please explain.

7. Will you be able to put aside any feelings of sympathy or pity for the defendant, if you have any, when deciding this case?

8. Does everybody understand that the defendant is entitled to a fair trial? Does everybody understand that the United States is also entitled to a fair trial?

9. Does anyone have any moral or religious reservations that might prevent you from standing in judgment of another human being?

10. The defendant in this case is charged with smuggling human beings into the United States for financial gain. Does anybody have strong feelings or opinions about United States Immigration laws that would prevent you from viewing the evidence impartially?

11. As you may know, some states, California among them, have had referendums regarding illegal aliens. Regardless of your position on the legalization or criminalization of immigration, if you become a juror in this federal trial, will you be able to follow the federal law of the United States as it presently stands and as the judge instructs you regarding the criminal smuggling of human beings?

12. Has anyone been a member of an organization involved in advocating for immigration legalization? Explain.

13. Does anyone feel the strongly about the United States' immigration policies? Explain.

14. The United States will call many law enforcement personnel as witnesses. Would that prevent you from being fair and impartial?

15. Do any of you feel that it should not be a crime to enter - or assist someone else to enter - the United States illegally?

16. When crossing the border from Mexico into the United States, have border inspectors ever found some other person hiding in a vehicle you were driving?

## VII

## JURY INSTRUCTIONS

The Government will submit proposed jury instructions under separate cover.

Dated: February 8, 2008                    Respectfully submitted,

KAREN P. HEWITT
United States Attorney

*/s/ Lawrence A. Casper*
_____
LAWRENCE A. CASPER
CHRISTINA M. McCALL
Assistant United States Attorneys
Attorneys for Plaintiff
United States of America
Email:   Lawrence.Casper@usdoj.gov
         Christina.McCall@usdoj.gov